UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

APR 2 3 2007

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

HAWK OPPORTUNITY FUND, L.P., )
and IRA FBO MARK F. ZIMMER, )
On Behalf of Themselves and All Others )
Similarly Situated, )

          Plaintiff,

      v.

YUCAIPA AMERICAN ALLIANCE
FUND I, L.P.; YUCAIPA AMERICAN
ALLIANCE (PARALLEL) FUND, L.P.;
INTERNATIONAL BROTHERHOOD
OF TEAMSTERS; and TEAMSTERS
NATIONAL AUTOMOBILE
TRANSPORTERS INDUSTRY
NEGOTIATING COMMITTEE,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. _____

**1 : 07 · CV – 0907** TWT

**COMPLAINT– CLASS ACTION**

*ORIGINAL*

JURY TRIAL DEMANDED

## I.   Introduction

Plaintiffs Hawk Opportunity Fund, L.P. ("Hawk") and IRA FBO

Mark F. Zimmer ("Zimmer" and, together with Hawk, "Plaintiffs"), by and

through their undersigned counsel, on behalf of themselves and all other

similarly situated holders of the common stock of Allied Holdings, Inc.

("Allied"). Allied is a publicly traded Georgia corporation which functions

as a holding company. The main business of Allied is the transportation and

delivery of automobiles and other vehicles for manufacturers, sometimes referred to as the "carhaul" business, and it is the largest motor carrier in North America specializing in the transportation of new automobiles, SUV's and light trucks. Plaintiff brings this action to recover damages and to obtain declaratory relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968 (2000 ed. and Supp.), and under the Georgia RICO (Racketeer Influenced and Corrupt Organizations) Act, O.C.G.A. § 16-14-1, *et seq.*, as well as specified claims under Georgia law, against the defendants named above, demanding trial by jury. Plaintiffs, in support of their claims, allege based upon personal knowledge as to allegations relating to themselves and their own acts, and otherwise on information and belief, as follows:

## II.   The Parties

1.

Plaintiff Hawk is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business in the Commonwealth of Pennsylvania. Hawk owns 302,000 shares (comprising approximately 3.4%) of Allied's issued and outstanding common stock.

2.

Plaintiff IRA FBO Mark Z. Zimmer ("Zimmer") is an individual retirement

2

account beneficially owned by Mark F. Zimmer, an adult individual who resides in and is a citizen of the State of Maine.  Zimmer owns 35,000 shares of Allied's issues and outstanding common stock.

3.

Defendant Yucaipa American Alliance Fund I, L.P. ("Yucaipa American Alliance Fund I"), is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business in the State of California.

4.

Defendant Yucaipa American Alliance (Parallel) Fund I, L.P. ("Parallel" and, together with Yucaipa Alliance I, "Yucaipa"), is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business in the State of California.

5.

Yucaipa is a private equity investment fund.  Yucaipa presently owns and controls Performance Transportation Services, Inc. ("PTS"), which is the principal competitor of Allied in the car haul business and holds the second largest share of the North American market for unionized carhaul services.

6.

Defendant International Brotherhood of Teamsters ("IBT") is a labor union with its principal offices in Washington, D.C.

3

7.

The IBT is organized into various divisions based, in part, on the industry in which the members of its affiliated local unions are employed. One such division is the Automobile Transport Division, which includes local unions representing members employed in the vehicle transportation industry.

8.

Defendant Teamsters National Automobile Transporters Industry Negotiating Committee ("TNATINC") (sometimes referred to as the National Automobile Transporters Labor Division Negotiating Committee), is a committee affiliated with the IBT which serves as the exclusive representative for purposes of collective bargaining of IBT-affiliated local unions employing approximately 4800 of the 6000 employees of the Allied.

### III.   Jurisdiction and Venue

9.

Plaintiffs bring the claims asserted in Counts I and II of this Complaint pursuant to the civil remedies section of RICO, 18 U.S.C. § 1964, seeking to recover treble damages and costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and the other members of the class that they seeks to represent have sustained, and will sustain, by reason of the violations of 18 U.S.C. § 1962 by the defendants named in such counts.

4

10.

This Court has subject matter jurisdiction over the claims asserted in Counts I and II of this Complaint pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 18 U.S.C. § 1964(c), because such claims arise under the laws of the United States, specifically RICO. This Court also has original jurisdiction over the claims asserted in each count of this action pursuant to the 28 U.S.C. § 1332 (d), because the matter in controversy in the case of each such claim exceeds the sum or value of $5,000,000, exclusive of interest and costs, and because this action is a class action in which one or more members of the plaintiff class is a citizen of a State different from one or more of the defendants.

11.

In connection with the wrongs alleged in Counts I and II of this Complaint the defendants named therein have used, directly or indirectly, means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate telephone communications.

12.

This Court has supplemental jurisdiction over the non-federal claims set forth in the remaining Counts of this Complaint, pursuant to 28 U.S.C. § 1367(a), as these claims are so interrelated to the claim set forth in the Counts I and II,

5

which are within the Court's original jurisdiction, that they form part of the same case or controversy under Article III of the United States Constitution.

13.

Venue is proper in this district pursuant to 18 U.S.C. § 1965, because all of the defendants transact business, or have agents who transact business on their behalf, in this district, and because the ends of justice require parties residing in other districts be brought before the Court in this district, and pursuant to 28 U.S.C. and 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in this district, and because certain of the defendants may be found in this district.

## IV. Class Action Allegations

14.

Plaintiffs brings this action on behalf of themselves individually and as a class action pursuant to the provisions of Rules 23(b)(2) and (3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all similarly situated holders of Allied common stock (the "Class"). Excluded from the Class are defendants and their respective corporate parents, subsidiaries, affiliates, officers, employees, members and co-conspirators.

6

15.

The members of the Class are so numerous that joinder of all individual members in this action is impractical. According to the last Form 10-K filed by Allied, which was filed on April 18, 2005, for the year ended December 31, 2004, there were approximately 8,910,000 shares of Allied common stock issued and outstanding as of the fourth quarter of 2004, held by approximately 2,200 holders of record.

16.

Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class. Among the common questions of law and fact are:

      a.    Whether defendants violated federal and state law by virtue of their wrongful conduct alleged herein;

      b. ·   Whether defendants Yucaipa and IBT constitute an "enterprise" within the meaning of RICO and Georgia RICO;

      c.    Whether defendants participated in and pursued the common course of conduct alleged herein;

      d.    Whether defendants Yucaipa and IBT engaged in "racketeering activity" as defined by RICO § 1961 and Georgia RICO,

7

e.     Whether defendants violated the statutory or common laws of the State of Georgia;

f.     Whether plaintiffs and the other members of the Class have sustained damages as a proximate result of the conduct of the defendants and, if so, the type and appropriate measure of such damages.

17.

Plaintiffs' claims are typical of the claims of the members of the Class, and all members of the Class have sustained damages as a result of the wrongful course of conduct alleged herein.

18.

Plaintiffs' interests are consistent with, and not antagonistic to, those of the remainder of the Class.  No conflict exists between plaintiffs and the other members of the Class with respect to this action or the claims for relief.

19.

Plaintiffs are members of and are able to and will fairly and adequately protect the interests of the Class.

20.

Plaintiffs are represented by counsel experienced in the prosecution of complex commercial litigation and class action litigation.

8

21.

The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

22.

A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The class is readily definable and is one for which purchase records exist. Prosecution as a class action will eliminate the possibility of repetitious litigation, while also providing redress for claims too small to support the expense of individual complex litigation.

## V. Factual Allegations

23.

Allied's main business - - the transportation and delivery of automobiles and other vehicles for manufacturers - - is conducted by Allied Automotive Group, Inc., ("AAG"), a direct subsidiary of Allied, and by various direct and indirect subsidiaries of AAG (collectively, with AAG, the "Automotive Group").

24.

At all times relevant to this action, certain of the entities in Allied's Automotive Group have been parties to a collective bargaining agreement (sometimes referred to as the "CBA") with local unions affiliated with the IBT,

and its industry negotiating committee, TNATINC, which serves as the exclusive collective bargaining representative for employees of Allied's Automotive Group, and also for employees of certain of Allied's competitor's in the car haul industry. As of February 1, 2007, the Allied Automotive Group had approximately 5,500 active employees, of whom approximately 3,300 were members of local unions represented by the TNATINC, making Allied's Automotive Group the largest unionized car haul operator in North America.

25.

On July 31, 2005 (the "Petition Date"), Allied and certain of its subsidiaries and affiliates (collectively, the "Debtors" or the "Allied Debtors") filed voluntary petitions for relief under Chapter 11 of title 11 of the Bankruptcy Code, captioned *In Re: Allied Holdings, Inc.*, Case Nos. 05-12515 through 05-12256 and 05-12528 through 05-12537, pending in the United States Bankruptcy Court for this District (collectively, the "Allied Chapter 11 Cases").

26.

At all times from and after the Petition Date and continuing to the present, the Allied Debtors have been authorized to operate, and have continued to operate, their respective businesses as debtors in possession, pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

10

27.

Pursuant 11 U.S.C. § 1121 and a series of Orders by the Bankruptcy Court, the Allied Debtors have at all relevant times continuing to the present had and maintained the exclusive right to file a Chapter 11 plan under section 1121 of the Bankruptcy Code.

28.

One of the main factors which led Allied and its affiliated debtors to commence the Allied Chapter 11 Cases was their need to obtain relief from the high labor costs associated with the existing collective bargaining agreement.

29

The collective bargaining agreement, and the exclusive contractual and statutory rights of the Allied affiliates which are parties to the agreement to seek to negotiate consensual modifications of the terms of the agreement, or to reject the agreement pursuant to 11 U.S.C. § 1113, constitute valuable intangible property of their respective Chapter 11 estates.

30.

By and through their actions, defendants have improperly exercised control over, and effectively obtained ownership of, these valuable intangible property rights from the Allied debtors for their own benefit, with the intent for the purpose

11

of using their ownership and control of such property rights to usurp for their own benefit the equity interests held by Plaintiffs and the Class.

31.

This action arises out of several separate but related schemes pursuant to which Yucaipa has colluded, combined and conspired with the IBT and the TNATINC to fraudulently, improperly and unlawfully interfere with, manipulate and abuse the Chapter 11 reorganization process of Allied and its affiliated debtors in the pending Allied Chapter 11 Cases, for their own benefit, and to the intended detriment of Allied's existing stockholders, including Plaintiff and the other members of the Class, through an ongoing pattern of racketeering activity involving mail fraud, wire fraud, obstruction of justice and extortion.

32.

Yucaipa's first known involvement in the Allied Chapter 11 Cases commenced in or about May 2006, when Yucaipa suddenly acquired a substantial portion of Allied's outstanding unsecured notes, and offered to advise and assist Allied in its negotiations with the IBT for consensual modifications to the collective bargaining agreement, to maximize the value of its Chapter 11 estate for the benefit of all of its creditors and stockholders.

12

33.

Yucaipa publicly portrayed itself, and introduced itself to Allied, its other creditors and stockholders, and to the Bankruptcy Court, as a labor-friendly investor and advisor with experience, expertise and a track-record in helping distressed businesses resolve difficult labor-management issues and restructure for the benefit of all stakeholders, including shareholders, customers and employees.

34.

To induce the Allied Debtors to allow Yucaipa to "assist" or "consult with" the Allied Debtors in their labor negotiations with the IBT, Yucaipa stressed its close relationships with senior the IBT leadership, as well as the close relationships among Yucaipa head Ronald W. Burkle, former President William Clinton, and IBT General President James P. Hoffa.

35.

According to an article that was later published in Forbes Magazine, Hoffa personally brought the potential Allied "deal" to Ronald Burkle, the founder and head of Yucaipa, at the urging of former President William Clinton, a personal friend of Burkle, as well as a senior advisor to The Yucaipa Companies, LLC and a profit participant in at least some of its affiliated funds:

13

To ferret out new steals and deals, [Burkle] counts on
rainmaker Clinton. The ex-President stands to do pretty
well from the arrangement. Burkle won't reveal the
details, but it appears that Clinton gets a cut of any
profits the company makes on two funds so long as the
return exceeds 8% a year. The former leader of the free
world is also believed to get a slice of Yucaipa's profits
when the international fund (the last of the four) is
finished liquidating five years from now or later. It is
plausible that, in a decade, Clinton could walk away with
tens of millions of dollars.

\*       \*       \*

"He's invaluable," Burkle says of his idol. President
Clinton "is unique, he brands us to people who matter.
He got us in with the Teamsters, and that's important for
deal flow going forward."

Yucaipa arranged for Clinton to make a speech at a
Teamsters conference in 2003, and later Clinton urged
Teamsters President James Hoffa Jr. [sic] to trust Burkle
and present him with possible deals. Result: This spring
Yucaipa paid $100 million to buy a controlling stake in
Allied Holdings, a trucking outfit in bankruptcy
proceedings. "Clinton got it to the point where Hoffa
actually helped us with that deal, something I couldn't
have gotten on my own," Burkle says.

Matthew Miller, The Rise of Ron Burkle, Forbes, December 11, 2006.

36.

The timing of Yucaipa's purchase of the Notes, and of its approach to Allied

were not coincidental. As of April 2006, when Yucaipa purchased the Notes, IBT

General President James P. Hoffa, who Burkle acknowledges brought the Allied

14

"deal" to Yucaipa, was in the midst of campaign for re-election to another five-year terms as General President of the IBT, in an election scheduled to be conducted in November 2006.

## 37.

As a result, the campaign period preceding the November 2006 IBT election was a particularly sensitive time in IBT internal politics. Given the circumstances, the period from May 2006 through November 2006 would have been a particularly inconvenient and problematic time for Hoffa to have to announce and explain to the rank-and-file membership of the IBT any concessions or givebacks to the Allied Employers in connection with any negotiated consensual modifications to the CBA, or, worse yet, a rejection of the CBA by the Allied Employers. The fallout from any such developments could have posed a real threat to Hoffa's re-election. As a result, as shown below, the IBT improperly sought to and did use Yucaipa to defer and effectively hide from the IBT membership the likelihood of the need for ultimate concessions to Allied from the voting members of the IBT - - especially members of local unions affiliated with the Automobile Transport/Carhaul Division - - until after the November 2006 election.

15

38.

The IBT and its members had reason to expect that the November 2006 election would be contentious, that turnout would be low, and, in particular, that the votes of members of its Automobile Transport/Carhaul Division might be a factor in the outcome of the election.

39.

Soon after Yucaipa purchased the Notes, on a date or dates presently unknown to Plaintiff, but prior to June 23, 2006, Yucaipa recommended that the Allied Debtors modify their strategy and approach with respect to the IBT and the TNATINC. Specifically, Yucaipa suggested that the Allied Debtors should not continue to actively pursue their rejection remedies under Section 1113 of the Bankruptcy Code (an approach that the Allied Debtors had believed would precipitate and accelerate meaningful negotiations with the IBT, which were then stalled), but should instead defer seeking any rejection of the CBA, continue to "negotiate" with the IBT and target a date later in the year as the time to resolve the issues relating to the CBA.

40.

To induce the Allied Debtors to follow its advice and recommendations, Yucaipa stated, represented or implied to Allied that: (a) filing such a motion prior to the re-election of Hoffa as IBT General President would negatively impact the

16

Debtors' efforts to realize labor concessions from the IBT, and (b) if the Debtors refrained from then filing the section 1113(b) motion, Yucaipa would be in a better position to assist the Debtors in obtaining favorable labor concessions following the election.

## 41.

Acting in reliance on Yucaipa's characterization of its experience, expertise and intent, Allied accepted Yucaipa's offer, and thereafter acted in reliance on Yucaipa's advice and guidance in connection with the nature, substance and timing of its negotiations with the IBT. In particular, Allied relied on Yucaipa's advice and recommendations in discontinuing its efforts to seek an extension of the previously granted interim relief under Section 1113(e) of the Bankruptcy Code, and in deferring its efforts to complete negotiations with the IBT for the consensual modification of the collective bargaining agreement, until after IBT elections which were scheduled to be held, and which were in fact held, in November 2006.

## 42.

Allied's decision to refrain from seeking any extension of the previously granted interim relief under Section 1113(e) of the Bankruptcy Code, and to defer efforts to complete the negotiation of consensual modifications to the collective bargaining agreement, resulted in the Allied debtors incurring at least six months

17

of unnecessarily high expenses, which had the intended effect of artificially (and temporarily) suppressing Allied earnings.

43.

After successfully causing Allied to defer any effort to seek relief under Section 1113 of the Bankruptcy Code until after the November 2006 IBT elections, Yucaipa, acting without the knowledge or authorization of Allied, secretly negotiated with the IBT and the TNATINC a "term sheet" for a proposed plan of reorganization of Allied and its affiliated debtors, and for the modification of the CBA to provide specified wage concessions to the reorganized debtors, which are essentially available exclusively for the benefit of Yucaipa.

44.

The secret term sheet had several intended purposes of effects. First, it effectively prevented the Allied debtors from negotiating more favorable concessions to the collective bargaining agreement. Second, it made the specified modifications to the collective bargaining agreement available solely for the benefit of Yucaipa, and thereby effectively to give Yucaipa the exclusive right to acquire Allied, and to enable Yucaipa to combine or merge Allied with its primary competitor, the Yucaipa-owned PTS, which would give Yucaipa ownership and control of a dominant share of the unionized vehicle transportation business in North America, together with market and pricing power in both the United States

and the North American markets. Third, the secret term sheet effectively precluded Allied from pursuing any bona fide auction or similar process to maximize the value received for its business by committing the IBT to a plan of reorganization controlled by Yucaipa. As a result, defendants have improperly prevented Allied or any other party from filing an alternative or competing proposed plan of reorganization that would maximize the recovery of the Allied estates, to the detriment of the Allied estates and their respective other creditors and stockholders.

45.

After negotiating the secret term sheet behind Allied's back, Yucaipa, the IBT and the TNATINC presented it to Allied on or about February 8, 2007, as a fait accompli. Yucaipa "invited" Allied to become a co-proponent of the plan outlined in the secret term sheet, and informed Allied that if it did not support the plan, Yucaipa and the TNATINC would withdraw their support for any further extension of exclusivity and would file the plan on their own, leaving Allied little practical choice, under the circumstances it then faced, but to support the plan proposed by Yucaipa and the TNATINC.

46.

Allied and its affiliated debtors, together with Yucaipa and the TNATINC, as co-proponents, have now filed a proposed plan of reorganization in the Allied

19

Chapter 11 Cases that is based on the secret term sheet. If confirmed in its present form, the plan would result in the cancellation of all existing equity interests in Allied, including the common stock held by Plaintiff and the other members of the Class it seeks to represent, without any distribution.

47.

The actions of Yucaipa, the IBT and the TNATINC in negotiating and executing the secret term sheet, and in causing and requiring Allied to file a proposed plan based on the secret term sheet, have disrupted and damaged Allied's reorganization efforts, and impaired its ability to maximize the value of its estate for the benefit of all of its stockholders and creditors. Because Allied still maintains the exclusive right to file a plan, the proposed plan (and the secret term sheet on which it is based) have had, and continue to have, a substantial chilling effect on other potential investors or plan proponents.

48.

The negotiation and execution of the secret term sheet, and the filing of the proposed plan based on the secret term sheet, were part and parcel of a series of illicit, express or tacit, agreements between Yucaipa and the IBT, pursuant to which the IBT achieved its goal of deferring and delaying any negotiated modifications to the Allied CBA, or any rejection of the Allied CBA, until after the November 2006 IBT elections.

20

49.

The actions of Yucaipa, the IBT and the TNATINC constitute actionable violations of RICO, Georgia RICO. Said actions also constitute various torts under the law of Georgia. Plaintiff brings this action on behalf of itself and a class of stockholders of Allied whose equity interests would be "cancelled" and who would receive no distribution under the Proposed Joint Plan, to obtain both injunctive relief and damages.

## VI.    The RICO Schemes and the Related Schemes to Defraud

50.

Yucaipa and the IBT have engaged in at least four separate but closely inter-related schemes: (a) corruptly seeking to influence the outcome of the vote of the members of the IBT in connection with the November 2006 election for General President; (b) wrongfully seeking to enable Yucaipa to acquire ownership and control of the Allied Debtors by misappropriating for their own benefit the value of the equity interests held by Plaintiff and the Class; (c) corruptly seeking to influence the outcome of the vote of the employees of the Allied debtors who are members of the Carhaul Division of the IBT on the proposed modifications of the collective bargaining agreement set forth in the secret term sheet, which for the foundation of the proposed plan, and (d) wrongfully obtaining and consolidating ownership and control of a dominant share of the vehicle transportation business in

21

North America, and thereby achieving and enabling Yucaipa or its affiliates to exercise market and pricing power in both the United States and the North American markets. Such schemes are referred to collectively as the "RICO Schemes."

51.

In connection with and in furtherance of the RICO Schemes, Yucaipa and the IBT devised a series of separate but closely interrelated schemes to defraud, including: (a) a scheme to defraud members of the IBT, in particular the employees of the Allied Debtors who are members of the IBT Carhaul Division, in connection with the November 2006 IBT elections, by deliberately creating the false impression, through and including the date of the election, that it had not been necessary, and would not be necessary, for the TNATINC to negotiate wage and other concessions in favor of the Allied Debtors; (b) a scheme to defraud the same Carhaul Division employees into believing that, if they did not vote to support the modifications to the collective bargaining agreement reflected in the secret term sheet and the proposed plan, the Allied Debtors would fail and liquidate, and the members would lose their jobs; (c) a scheme to defraud the Allied Debtors, and Allied's stockholders, including plaintiffs and the other members of the Class, into believing that Yucaipa intended to act, and was in fact acting, in the best interests of Allied and its other creditors and stockholders, and in the interest of maximizing

22

the value of the Allied Debtors for the benefit of all of its creditors and stockholders, when in fact Yucaipa at all relevant times intended to act and acted solely in furtherance of its own interests, and the interests of the IBT, and to the detriment of the other creditors and stockholders of Allied; (d) a scheme to defraud the members of the IBT employed by the Debtor Defendants into believing that the Allied Debtors would not survive, and would be liquidated, and that the member employees would lose their jobs, if they did not support the modifications to the CBA set forth in the Secret Term Sheet and the Proposed Joint Plan; and (e) a scheme to defraud the Allied Debtors into believing that the Allied Debtors would be insolvent, and face liquidation, if they did not file and support the Proposed Joint Plan. The foregoing schemes are referred to collectively as the "Schemes to Defraud."

## VII.  RICO Predicate Acts

### A.  Obstruction of Justice in Violation of 18 U.S.C. § 1503

52.

At all times from and after July 31, 2005, and continuing to the present, the Allied Employers, as well as each of the other Allied Debtors, in their respective capacities as debtors in possession, were officers of a court of the United States, within the meaning of 18 U.S.C. § 1503.

23

53.

At all times from July 31, 2005 and continuing to the present, the Allied Chapter 11 Cases have been pending judicial proceedings constituting the administration of justice within the meaning of 18 U.S.C. § 1503.

54.

At all relevant times, Yucaipa, the IBT and the TNATINC knew or had notice of the Allied Chapter 11 Cases, and of the fact that the Allied Employers were operating their respective business as debtors in possession.

55.

In negotiating and executing the Secret Term Sheet as detailed above (or, in the case of the IBT, in causing and permitting the TNATINC to negotiate and execute the Secret Term Sheet), Yucaipa, the IBT and the TNATINC acted with knowledge that the execution of the Term Sheet was likely to influence, intimidate or impede the Allied Employers in the discharge of their duties relating to their own negotiation with the TNATINC for modifications to the CBA, and with the wrongful intent and for improper purpose of thereby influencing, intimidating or impeding the Allied Employers in the discharge of their duties as debtors in possession and officers of the court.

24

56.

In negotiating and executing the Secret Term Sheet as detailed above (or, in the case of the IBT, in causing and permitting the TNATINC to secretly negotiate and execute the Term Sheet), Yucaipa, the IBT and the TNATINC also acted (a) with knowledge that the execution of the Secret Term Sheet was likely to influence, obstruct or impede the due administration of justice in the Chapter 11 Cases by (i) interfering with the ability of the Allied Employers to assume or reject the CBA in accordance with the provisions of Section 1113 of the Bankruptcy Code, (ii) interfering with the ability of the Allied Employers to confer in good faith with TNATINC "in attempting to reach mutually satisfactory modifications" to the CBA (if not completely preventing the Allied Companies from doing so), and (iii) interfering with the ability of the Allied Debtors to consider, obtain, negotiate, prepare, propose or support potential alternative plans, and (b) with the wrongful intent and for the improper purpose of thereby influencing, obstructing or impeding the due administration of justice.

57.

In particular, in negotiating and executing the Secret Term Sheet as detailed above (or, in the case of the IBT, in causing and permitting the TNATINC to negotiate and execute the Secret Term Sheet), Yucaipa, the IBT and the TNATINC acted with the knowledge and intent that the Secret Term Sheet would operate, in

25

effect, to lock-up the TNATINC, and effectively prevent the Allied Employers from negotiating different or other modifications to the CBA directly with the TMATINC, or from giving other prospective plan proponents the benefit of the same modifications negotiated by Yucaipa.

58.

By their foregoing conduct, Yucaipa, the IBT and TNATINC have, for the purpose of executing the schemes described above (a) corruptly endeavored to influence, intimidate or impede the Allied Debtors, officers of a court of the United States, in the discharge of their respective duties as debtors in possession, and (b) corruptly endeavored to influence, obstruct and impede, the due administration of justice in the pending Allied Chapter 11 Cases, all in violation of 18 U.S.C. § 1503.

## B. Mail Fraud in Violation of 18 U.S.C. § 1341

59.

For the purpose of executing the foregoing Schemes to Defraud, or attempting to do so, Yucaipa and the IBT knowingly caused matters and things to be sent and delivered by mail by the Postal Service, and by commercial interstate carriers, in violation of 18 U.S.C. § 1341, including the following:

a. on or about March 14, 2007, Yucaipa caused the Allied Debtors to send a materially misleading letter dated March 14, 2007, from Yucaipa

26

Companies to all employees of the Allied Debtors who are members of the IBT, urging such employees to vote to approve or support the modification of the CBA set forth in the Secret Term Sheet, which falsely stated that if the employees did not vote to support the modifications as part of the related Proposed Joint Plan, the Allied Debtors would not "survive" and would be liquidated, and as a consequence the employees would lose their jobs; and

        b.  on or about March 19, 2007, the IBT mailed ballots to all employees of the Allied Debtors who are members of the IBT for a referendum on the proposed modifications to the CBA set forth in the Secret Term Sheet.

## C.   Wire Fraud, in Violation of 18 U.S.C. § 1343

### 60.

For the purpose of executing or attempting to execute the foregoing Schemes to Defraud, the Allied Debtors, Yucaipa and the IBT transmitted or caused to be transmitted writings, signals and sounds by means of wire communications in interstate commerce, in violation of 18 U.S.C. § 1343, including the following:

        a.  on February 12, 2007, the IBT and the TNATINC conducted a telephone conference call in which senior IBT officers, including General President Hoffa and Fred Zuckerman, Director of the Carhaul Division, presented the details of the Secret Term Sheet to the leaders of the affected Local Union

27

Defendants, in an effort to elicit and obtain their support, and to begin laying the groundwork to obtain the support of the members of the Local Union Defendants;

b.    the IBT has posted and published on the Carhaul Division section (www.teamsters.org/divisions/carhaul/carhaul.asp) of its web site (www.teamsters.org), and thereby disseminated via the internet, a series of false or materially misleading writings regarding the Secret Term Sheet, the Proposed Joint Plan, and the alternative plan proposals submitted by Sopris, intended to cause and induce the members of the IBT local unions represented by the TNATINC to vote in favor of modifications to the Allied CBA underlying the Proposed Joint Plan, in a referendum being conducted by the IBT, including, without limitation:

(i)  a news release dated February 19, 2007 entitled "Carhaul Members Get First Hand Report on Yucaipa Plan";

(ii)  a news release dated February 21, 2007 entitled "Judge for Yourself", including an attached purported "side-by-side comparison" of Yucaipa's "proposal" versus the "plan" filed by Allied management;

(iii)    a news release dated February 23, 2007, entitled "Teamsters Carhaul Director Responds to Local Leader's Irresponsible Protest", including attached letters dated February 22, 2007 from Fred Zuckerman, Director of the INT Carhaul Division;

28

(iv) a news release dated March 3, 2007, entitled "Allied Files

Plan That Will Save Company and 3,500 Teamster Carhaul Jobs";

(v) a news released dated March 21, 2007, entitled "TDU

Spreads Misinformation About Carhaul Proposal" including a purported

comparison of the Yucaipa "proposal" and the alternative plan proposal submitted

by Sopris; and

(vi) a news release dated March 29, 2007, entitled "There Is

Only One Plan to Save Allied".

## E. Extortion in Violation of Hobbs Act, 18 U.S.C. § 1951

61.

The Hobbs Act, 18 U.S.C. § 1951(a), provides in relevant part that:

> Whoever in any way or degree obstructs, delays or
> affects commerce ... by ... extortion or attempts or
> conspires so to do ... shall be fined under this title or
> imprisoned not more than twenty years, or both.

62.

The Hobbs Act defines extortion as "the obtaining of property from another,

with his consent, induced by wrongful use of actual or threatened force, violence,

or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (emphasis added).

29

63.

The Allied Debtors had or have a variety of intangible rights which constitute protected "property" under Georgia law, and therefore within the meaning of 18 U.S.C. § 1951(b)(2), including:

a.      the intangible right to make business decisions and pursue their business interests free from fear of wrongful threats of economic harm, interference and concerted action on the part of Yucaipa, the IBT and the TNATINC;

b.      the inherent contractual rights of the Allied Employers, as parties to the collective bargaining agreement, as well as their statutory rights under 11 U.S.C. § 1113, to seek to negotiate consensual modifications to the collective bargaining agreement with the Allied Employee Unions and the TNATINC which provided the Allied Employers with the most favorable wage and work rule concessions available under the circumstances, without interference from Yucaipa or any other creditors or third-parties;

c.      the right to seek rejection of the collective bargaining agreement under 11 U.S.C. § 1113(b), and to seek interim relief from the collective bargaining agreement under 11 U.S.C. § 1113(e);

d.      the right to determine whether to exercise their statutory right to file a plan or plans of reorganization of the Allied Debtors, for the period referred

30

to in 11 U.S.C. § 1121(b), as increased by the Court pursuant to 11 U.S.C. § 1121(d), or to waive such right, and thereby to permit and encourage potential third-party plan proponents to file alternative plans, as they determined would maximize the recovery for the Allied Debtors, their creditors and equity holders, including Plaintiff and the other members of the Class; and

e.    the right to pursue claims and causes of action against any third-parties, including Yucaipa and the IBT, who unlawfully interfere with any of the foregoing intangible property rights.

64.

Yucaipa, the IBT and the TNATINC had no lawful claim or right to any of the foregoing intangible property rights of the Allied Debtors.

65.

By their actions set forth above, including (a) surreptitiously negotiating and executing the secret term sheet without the knowledge or consent of the Allied Debtors, and (b) threatening to withdraw support for any further extension of the exclusivity period, and upon expiration of exclusivity to then file the plan outlined in the secret term sheet, with or without Allied's support, Yucaipa, the IBT and the TNATINC wrongfully attempted to and did place the Allied Debtors in fear of catastrophic economic loss if they did not consent to effectively convey and transfer the intangible property identified in the preceding paragraph to Yucaipa,

31

and/or to the IBT and the TNATINC by acquiescing in and joining as a proponent of the Proposed Joint Plan.

66.

The IBT and the TNATINC also wrongfully attempted to and did place Allied in fear of catastrophic economic losses by: (a) failing and refusing to negotiate in good faith directly with Allied and its representatives for the necessary modifications to the CBA; (b) instead negotiating the modification of the CBA directly (and surreptitiously) with Yucaipa; (c) anticipatorily refusing to implement the proposed modifications to the CBA negotiated with Yucaipa in connection with any plan of reorganization of which Yucaipa was not a proponent, thus refusing to give the Allied Employers the benefit of the same modifications to the CBA that it agreed to with Yucaipa in connection with a plan or reorganization proposed by anyone other than Yucaipa; and (d) threatening strikes or work stoppages if the Allied Debtors did not acquiesce to and support the proposed plan.

67.

Yucaipa also wrongfully attempted to and did place Allied in fear of catastrophic economic losses by: (a) repeatedly advising, stating, representing and leading the Allied Debtors to believe that the Allied Employers would never be able to obtain the necessary modifications to the CBA through direct negotiations with the TNATINC; (b) repeatedly advising, stating, representing and leading the

32

Allied Debtors to believe that the Allied Employee Unions would engage in strikes and work stoppages if the Allied Debtors pursued the continued implementation of interim changes to the CBA under 11 U.S.C. 1113(e), or applied to reject the CBA under 11 U.S.C. 1113 § (e) and (d).

### 68.

Based on the genuine fear of economic harm and loss precipitated by the wrongful conduct of Yucaipa, the IBT and the TNATINC, the Allied Debtors agreed to become co-proponents of the plan set forth in the secret term sheet, and thereby effectively conveyed their intangible property rights outlined above to Yucaipa and/or the IBT and TNATINC.

### 69.

By and through their respective actions set forth above, Yucaipa, the IBT and the TNATINC wrongfully obtained or attempted to obtain property from Allied, with its consent, which Yucaipa, the IBT and the TNATINC induced by means of the wrongful use of fear of economic harm.

### 70.

By and through their respective actions set forth above, Yucaipa, the IBT and the TNATINC intentionally and wrongfully obstructed, delayed and affected commerce by extortion, or conspired and attempted extortion, to do so, in violation of the Hobbs Act.

33

## COUNT I

## VIOLATION OF RICO § 1962(C)

### 71.

Plaintiffs restate and incorporate the allegations set forth in paragraphs 1 through 70 above as if set forth in full.

### 72.

Each of the defendants is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

### 73.

Defendants Yucaipa, the IBT and the TNATINC (including certain of their respective individual officers, agents and employees not named in this Complaint) comprised a group of persons associated together in fact for the common purpose of carrying out the RICO Schemes and the Schemes to Defraud described in this Complaint. As a result, defendants Yucaipa, the IBT and the TNATINC (including certain of their respective individual officers, agents and employees not named in this Complaint) constitute an association-in-fact enterprise (the "Yucaipa/IBT Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

74.

At all relevant times, the Yucaipa/IBT Enterprise has been engaged in, and its activities have affected, interstate commerce, within the meaning of 18 U.S.C. § 1962(c).

75.

The acts of defendants Yucaipa, the IBT and the TNATINC set forth above, and in particular those set forth in paragraphs 52 through 70 above (collectively, the "RICO Predicate Acts"), constitute indictable violations of one or more of the following statutes:  18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); and 18 U.S.C. § 1951 (extortion). Under Georgia law, the acts by IBT set forth above are also chargeable as theft by extortion and punishable by imprisonment for more than one year under the Code of Georgia Annotated, § 16-8-16. As a result, by engaging in the RICO Predicate Acts, defendants Yucaipa and IBT engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

76.

At all relevant times, defendants Yucaipa, the IBT and the TNATINC conducted and/or participated in the conduct of Yucaipa/IBT Enterprise, directly or indirectly, through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

35

77.

The RICO Predicate Acts alleged above involve two or more acts of racketeering activity which occurred within a ten year period of each other.

78.

The acts of racketeering activity alleged were related to each other by virtue of common participants (Yucaipa, the IBT and the TNATINC), common victims (Allied and its stockholders), a common method of commission (fraudulent misrepresentations to the Allied Debtors and Plaintiff, wrongful manipulation of the Allied Chapter 11 Cases), and common results (the Secret Term Sheet, the proposed plan and the exclusion of prospective proponents of competing plans, including Sopris), the schemes described above, and were not isolated events.

79.

The separate acts of racketeering activity alleged above amount to or pose a threat of continued criminal activity. The completed acts alleged amount to continued criminal activity in that they involve multiple schemes and ongoing criminal conduct which has lasted more than twelve months, and also in that they involve conduct that, by its nature, involves the threat of continuation or repetition in the future.

36

80.

Unless declared to be unlawful by this Court, the racketeering activity alleged above poses a real threat of becoming a model for similar future "deals" between Yucaipa and the IBT (or other labor unions) in situations involving chapter 11 reorganizations of financially distressed businesses which are parties to collective bargaining agreements, and thus poses a threat of future continuation of the racketeering conduct alleged above. The threat of future continuation of the racketeering conduct alleged above is underscored by Ron Burkle's observation in the Forbes Magazine article cited above, that his introduction to IBT General President Hoffa was "important for deal flow going forward."

81.

Each of defendants directly participated in the commission of two or more of the foregoing RICO Predicate Acts.

82.

The fraudulent schemes described herein began no later than April 2006, and are ongoing.

83.

As a direct and proximate result of the violation of 18 U.S.C. § 1962(c) by the defendants, Plaintiffs and the other members of the Class have been injured in their business and property, in an amount to be determined at trial.

37

84.

Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to recover threefold their damages plus costs and attorneys' fees from defendants.

## COUNT II

## RICO CONSPIRACY § 1962(D)

85.

Plaintiffs restate and incorporate the allegations set forth in paragraphs 1 through 84 above as if set forth in full.

86.

For purposes of the claim set forth in this Count, the Allied Debtors are an "enterprise" (the "Allied Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

87.

At all relevant times, defendants Yucaipa, the IBT and TNATINC unlawfully conspired to violate the provisions of 18 U.S.C. § 1962(b) by acquiring ownership and control of the Allied Enterprise through a pattern of racketeering activity, and in furtherance of such conspiracy committed the RICO Predicate Acts, all in violation of 18 U.S.C. § 1962(d).

38

88.

As a direct and proximate result of defendants' violation of 18 U.S.C. § 1962(d), Plaintiffs and the other members of the Class have been injured in their business and property, in an amount to be determined at trial.

89.

Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to recover threefold their damages plus costs and attorneys' fees from the defendants.

## COUNT III

## VIOLATION OF GEORGIA RICO
## O.G.C.A § 16-14-4(B)

90.

Plaintiffs restate and incorporate the allegations set forth in paragraphs 1 through 89 above as if set forth in full.

91.

The Yucaipa/IBT Enterprise also constitutes an "enterprise" within the meaning of O.G.C.A § 16-14-3.

92.

By engaging in the RICO Predicate Acts set forth above, particularly as set forth in paragraphs 52 through 70 above, which are also predicate acts as defined in the Georgia RICO statute, defendants Yucaipa, the IBT and the TNATINC

engaged in "racketeering activity" within the meaning of O.G.C.A § 16-14-3(9)(B).

93.

At all relevant times, defendants Yucaipa, the IBT and the TNATINC conducted and/or participated in the conduct of Yucaipa/IBT Enterprise, directly or indirectly, through a pattern of racketeering activity, within the meaning of O.G.C.A § 16-14-3(8), in violation of O.G.C.A § 16-14-4(b).

94.

Each of defendants committed and/or aided and abetted in the commission of two or more of the foregoing acts of racketeering activity.

95.

For the reasons set forth above, the acts of racketeering activity referred to above also constituted a "pattern of racketeering activity" within the meaning of O.G.C.A § 16-14-3(8).

96.

As a direct and proximate result of the violation of O.G.C.A § 16-14-4(b) by the defendants, Plaintiffs and the other members of the Class have been injured in their business and property, in an amount to be determined at trial.

97.

Pursuant to O.G.C.A § 16-14-6(c), Plaintiffs and the Class are entitled to recover three times the actual damages sustained by them, together with punitive damages, attorneys' fees and costs of investigation and litigation reasonably incurred from the defendants.

## COUNT IV

## CONSPIRACY IN VIOLATION OF GEORGIA RICO O.G.C.A § 16-14-4(C)

### (Against All Defendants)

98.

Plaintiffs restate and incorporate the allegations set forth in paragraphs 1 through 97 above as if set forth in full.

99.

For purposes of the claim stated in this Count IV, the Allied Enterprise is also an "enterprise" within the meaning of O.G.C.A § 16-14-3(6).

100.

At all relevant times, defendants Yucaipa, the IBT and the TNATINC unlawfully conspired or endeavored to violate the provisions of O.G.C.A § 16-14-4(a) by acquiring, directly or indirectly, ownership and control of the Allied Enterprise through a pattern of racketeering activity, and in furtherance of such

41

conspiracy committed the RICO Predicate Acts, all in violation of O.G.C.A § 16-14-4(c).

## 101.

As a direct and proximate result of the violation of O.G.C.A § 16-14-4(c) by the defendants, Plaintiff and the other members of the Class have been injured in their business and property, in an amount to be determined at trial.

## 102.

Pursuant to O.G.C.A § 16-14-6(c), Plaintiff and the Class are entitled to recover three times the actual damages sustained by them, together with punitive damages, attorneys' fees and costs of investigation and litigation reasonably incurred from the defendants.

## COUNT V

## TORTIOUS INTERFERENCE

## (Against All Defendants)

## 103.

Plaintiffs restate and incorporate the allegations set forth in paragraphs 1 through 102 above as if set forth in full.

42

104.

The acts of defendants Yucaipa, the IBT and the TNATINC set forth above

constitute tortious interference with the business relationship between Allied and

its shareholders, including Plaintiffs, including, without limitation, the fiduciary

relationship arising out of Allied's role as a debtor in possession, causing Plaintiffs

and the other members of the Class to sustain substantial damage for which

defendants are liable.

105.

In tortiously interfering with the business and fiduciary relationship between

Allied and its shareholders, as set forth above, Yucaipa, the IBT and the

TNATINC acted outrageously, in that they acted either with malice toward the

existing shareholders of Allied, including Plaintiffs and the Class, or with reckless

indifference to the effect that their conduct would have on the rights of Plaintiffs

and the Class, entitling Plaintiffs and the Class to recover punitive damages, as

well as compensatory damages.

## COUNT VI

## DECLARATORY JUDGMENT

106.

Plaintiffs restate and incorporate the allegations set forth in paragraphs 1

through 105 above as if set forth in full.

43

107.

Yucaipa, the IBT and the TNATINC have engaged, and continue to enage,
in actions which, Plaintiffs and the Class maintain, have unlawfully and
impermissibly interfered with the ongoing business and fiduciary relationship
between Plaintiffs and the other members of the Class, on the one hand, and Allied,
on the other hand, and which constitute an unlawful pattern of racketeering
activity.

108.

By reason of the foregoing, a present controversy exists between Plaintiffs
and the other members of the Class, on the one hand, and Yucaipa, the IBT and the
TNATINC, on the other hand, entitling Plaintiffs and the Class to a judgment
declaring that Yucaipa, the IBT and the TNATINC, have engaged and are
continuing to engage in an unlawful pattern of racketeering activity, and that
Yucaipa, the IBT and the TNATINC were not and are not entitled to interfere with
the business and fiduciary relationships between Plaintiffs and the other members
of the Class, on the one hand, and Allied, on the other hand, in the manner alleged.

44

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, individually, and on behalf of the Class, respectfully pray that this Court enter judgment in favor of Plaintiffs and the Class, and against the Defendants, and each of them, jointly and severally, granting the following relief:

A.  Declaring that this lawsuit is maintainable as a class action and certifying Plaintiffs as representatives of the Class;

B.  On the claim for relief set forth in Count I, for violation of the RICO statute, 18 U.S.C. § 1962(c), judgment for compensatory damages in an amount to be determined at trial, but reasonably believed to be in excess of $50 million, with such amount to be trebled pursuant to 18 U.S.C. § 1964(c), together with costs of suit, including reasonable attorneys' fees;

C.  On the claim for relief set forth in Count II, for conspiracy in violation of the RICO statute, 18 U.S.C. § 1962(d), judgment for compensatory damages in an amount to be determined at trial, but reasonably believed to be in excess of $50 million, with such amount to be trebled pursuant to 18 U.S.C. § 1964(c), together with costs of suit, including reasonable attorneys' fees;

D.  On the claim for relief set forth in Count III, for violation of the Georgia RICO statute, O.C.G.A. § 16-14-4(b), judgment for three times the actual

damages sustained by them, in an amount to be determined at trial, but reasonably believed to be in excess of $50 million before trebling, together with punitive damages in an amount determined to be appropriate, attorneys' fees and costs of investigation and litigation reasonably incurred by them, all pursuant to O.C.G.A. § 16-14-6;

E.   On the claim for relief set forth in Count IV for conspiracy in violation of O.C.G.A. § 16-14-4(c), judgment for three times the actual damages sustained by them, in an amount to be determined at trial, but reasonably believed to be in excess of $50 million before trebling, together with punitive damages in an amount determined to be appropriate, attorneys' fees and costs of investigation and litigation reasonably incurred by them, all pursuant to O.C.G.A. § 16-14-6;

F.   On the common law claim for relief set forth in Count V for tortious interference, compensatory damages in an amount to be determined at trial, together with punitive damages in an amount determined to be just and proper;

G.   On the claim for declaratory judgment set forth in Count VI, declaring that Yucaipa, the IBT and the TNATINC have wrongfully interfered, and continue to wrongfully interfere, with the ongoing business and fiduciary relationships between Plaintiffs and the Class, on the one hand, and Allied, on the other hand, and have engaged in a pattern of racketeering activity; and

46

H.     Such other and further relief as the nature of the case may require or

as the Court may determine to be just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues triable by jury in this action.

Respectfully submitted, this 23rd day of April, 2007.

DOFFERMYRE, SHIELDS,
CANFIELD, KNOWLES AND
DEVINE, LLC

BY:

Everette L. Doffermyre
Georgia Bar No. 224750
Foy R. Devine
Georgia Bar No. 219900
David S. Hagy
Georgia Bar No. 317010

1355 Peachtree Street
Suite 1600
Atlanta, Georgia 30309
(404) 881-8900

OF COUNSEL:
Thomas S. McNamara
Indik & McNamara, P.C.
2230 Land Title Building
100 South Broad Street
Philadelphia, PA 19110
(214) 567-7125

Attorneys for Plaintiffs